CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
JAMES ANGLIN FLYNN (Bar No. 337608)
Email: james_flynn@fd.org
DREW HAVENS (Bar No. 306280)
Deputy Federal Public Defenders
321 East 2nd Street
Los Angeles, CA 90012-4202
Telephone: (213) 894-2854
Fax: (213) 893-0081

Attorneys for Defendant
ISMAEL GARCIA, JR.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:25-cr-655-MEMF |
| *Plaintiff*, | **Notice of Motion and Motion to Dismiss Indictment and to Disqualify** |
| v. | |
| ISMAEL GARCIA, JR., | **Proposed Hearing Date: Oct. 9, 2025** |
| *Defendant*. | Indictment: Aug. 8, 2025<br>FPTC: Feb. 19, 2026<br>Trial: Mar. 3, 2026<br>Final Speedy Trial Date: Oct. 17, 2025[1] |

---

[1] On August 27, 2025, the parties filed a stipulation for an order continuing the current September 4, 2025 trial date. Dkt. 18. The dates noted above reflect those proposed by the parties in that pending stipulation.

Ismael Garcia, through his counsel of record, Deputy Federal Public Defenders James Anglin Flynn and Drew Havens, hereby moves the Court to void and dismiss the indictment, Dkt. 13, and to disqualify Bilal A. Essayli and any attorneys working under his supervision from participating in criminal prosecutions in this district.

## INTRODUCTION

After 120 days, Bilal A. Essayli's lawful term as the interim U.S. Attorney ended as required by statute on July 30, 2025. *See* 28 U.S.C. § 546(c)(2). With similar expiration dates looming in this and at least four other judicial districts, Mr. Essayli disclosed in an interview that his service might continue: "We've got some tricks up our sleeves."[2] The government then began to describe Mr. Essayli as the "Acting United States Attorney," as it did when it secured the instant indictment against Mr. Garcia on August 8. Dkt. 13, at 5.

This was a trick because it circumvented limitations that Congress has imposed on temporary service in important federal offices like U.S. Attorney. The Federal Vacancies Reform Act (FVRA) does not authorize Mr. Essayli's acting service, because among other problems he is statutorily ineligible. *See* 5 U.S.C. § 3345(a). Any acting service under the FVRA would also be barred by that 120-day statutory clock. 28 U.S.C. § 546(c)(2). That clock is there for a reason: Congress previously repealed and then quickly reenacted it, realizing it

---

[2] Brittny Mejia et al., *Trump Administration Maneuvers to Keep Essayli as L.A.'s Top Federal Prosecutor*, L.A. Times (July 29, 2025), https://perma.cc/S79U-A895.

was necessary to curb instances of repeated temporary appointments in circumvention of the Senate's advice-and-consent role.[3]  Whether or not statutorily authorized, Mr. Essayli's continued service also violates the Appointments Clause.  U.S. Const. art. II, § 2, cl. 2.

One district court has weighed in so far, and it resoundingly rejected the government's similar maneuver in New Jersey.  *United States v. Giraud*, No. 1:24-cr-768, 2025 WL 2416737 (D.N.J. Aug. 21, 2025) (Brann, C.J., sitting by designation), *appeal docketed*, Nos. 25-2635, -2636 (3d Cir. Aug. 25, 2025). Most relevant here, the *Giraud* Court agreed that the person purporting to serve as acting U.S. Attorney was not eligible to do so under the FVRA.  *Id.* at *13–19 (applying § 3345(a)).

Mr. Essayli "was not lawfully acting as the United States Attorney in any capacity" on August 8 when the government obtained the indictment.  *Id.* at *8. And he has no such lawful authority today.  *See id. at* *27–28.  This Court should therefore void and dismiss the indictment with prejudice.  The Court should also disqualify Mr. Essayli and any attorneys working under his supervision from participating in criminal prosecutions in this district.

---

[3]  *See* Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224, 224.

# TABLE OF CONTENTS

FACTUAL BACKGROUND ...................................................................14

The administration appoints Mr. Essayli on an interim basis, then
    purports to direct him to serve on an acting basis. ......................14

The administration has pursued similar maneuvers in at least four other
    districts. ................................................................................15

    1.    District of New Jersey. ........................................................15

    2.    District of Nevada. ..............................................................18

    3.    Northern District of New York. ...........................................20

    4.    District of New Mexico. .......................................................21

Under Essayli's supervision, the government secures an indictment
    against Mr. Garcia. ...................................................................22

LEGAL BACKGROUND ......................................................................23

I.  28 U.S.C. § 546: Interim Appointment by Attorney General or
    District Court. ...........................................................................23

II.  5 U.S.C. § 3345: Acting Service Under the Federal Vacancies
    Reform Act. .............................................................................24

ARGUMENT ....................................................................................26

I.  Mr. Essayli is not lawfully serving as U.S. Attorney. .................................28

    I.A.    Mr. Essayli is not an eligible acting officer under 5 U.S.C.
        § 3345. .............................................................................28

        I.A.1. Mr. Essayli is not eligible to fill the January 17 FVRA
            vacancy ...................................................................28

    I.B.    There was no qualifying vacancy in July. ...........................................31

    I.C.    The President did not designate Mr. Essayli for acting service. .........35

I.D.    Mr. Essayli's designation as a special attorney cannot displace the FVRA's limits. .......................................................................36

II.  Even if Mr. Essayli were eligible under 5 U.S.C. § 3345, he has exhausted the 120-day clock at 28 U.S.C. § 546(c)(2)..............................36

II.A.  A non-confirmed U.S. Attorney designated under § 546(a) cannot serve more than 120 days. .........................................37

II.B.  A contrary reading would render § 546(d) superfluous. ....................39

II.C.  The Court should enforce § 546's 120-day limit to prevent the "mischief" that prompted its enactment. ..............................................44

III. The Appointments Clause requires an interim or acting U.S. Attorney to be Senate-confirmed. ........................................49

III.A.  U.S. Attorneys are principal officers requiring Senate confirmation. ......................................................................49

III.B.  Under the government's interpretation of the statutes, interim and acting U.S. Attorneys are principal officers requiring Senate confirmation .......................................................................53

IV. The Court should issue all appropriate remedies for Mr. Essayli's unlawful actions and supervision. ...............................................54

IV.A.  The Court should void and dismiss the indictment with prejudice. .........................................................................55

IV.B.  The Court should disqualify Mr. Essayli and his supervisees from participating in criminal proceedings in this district.................61

CONCLUSION.........................................................................63

# TABLE OF AUTHORITIES

**Cases**

*Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003
(9th Cir. 2006) ........................................................................................... 33

*AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) ...................................... 45

*Bond v. United States*, 572 U.S. 844 (2014) ......................................................... 44

*Boudette v. Barnette*, 923 F.2d 754 (9th Cir. 1991) .............................................. 39

*Bullock v. U.S. Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112 (D.
Mont. 2020) ............................................................................................... 62

*Collins v. Yellen*, 594 U.S. 220 (2021) .................................................................. 61

*Corley v. United States*, 556 U.S. 303 (2009) .................................................. 40, 43

*Cuomo v. Clearing House Ass'n, LLC*, 557 U.S. 519 (2009) ............................... 42

*Donziger v. United States*, 143 S. Ct. 868 (2023) ................................................. 57

*Doolin Sec. Sav. Bank v. Office of Thrift Supervision*, 139 F.3d 203
(D.C. Cir. 1998) .................................................................................... 32, 33

*Edmond v. United States*, 520 U.S. 651 (1997) ............................................... 50, 51

*Freytag v. Comm'r*, 501 U.S. 868 (1991) .............................................................. 34

*Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of
Homeland Sec.*, 107 F.4th 1064 (9th Cir. 2024) ............................... 26, 32, 61

*Gorecki v. Comm'r, Soc. Sec. Admin.*, 143 F.4th 1295 (11th Cir. 2025) ............... 43

*Hooks v. Kitsap Tenant Support Services, Inc.*, 816 F.3d 550 (9th Cir.
2016) ............................................................................................. 25, 35, 37

*In re Fairfield Sentry Ltd.*, No. 22-2101, 2025 WL 2218836 (2d Cir.
2025) ......................................................................................................... 44

*In re Persico*, 522 F.2d 41 (2d Cir. 1975)....................................................35

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d
    1332 (D.C. Cir. 2012)........................................................52

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ............................................34

*Jooce v. FDA*, 981 F.3d 26 (D.C. Cir. 2020)............................................32

*L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1 (D.D.C. 2020) .........................29

*Lucia v. SEC*, 585 U.S. 237 (2018)............................................................55

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc)......................53

*Morales v. Trans World Airline, Inc.*, 504 U.S. 374 (1992)...................38

*Morrison v. Olson*, 487 U.S. 654 (1988) ............................................ 50, 51

*Morton v. Mancari*, 417 U.S. 535 (1974)................................................38

*Murphy Co. v. Biden*, 65 F.4th 1122 (9th Cir. 2023)...............................39

*Myers v. United States*, 272 U.S. 52 (1926) ...........................................50

*Nadler v. Mann*, 951 F.2d 301 (11th Cir. 1992) ......................................50

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318 (1992) ...................45

*NLRB v. Hearst Pubs.*, 322 U.S. 111 (1944) ...........................................45

*NLRB v. SW General, Inc.*, 580 U.S. 288 (2017) .............................. 25, 54

*Olympic Fed. Sav. & Loan Ass'n v. Dir., Off. of Thrift Supervision*,
    732 F. Supp. 1183 (D.D.C. 1990).......................................32

*Pub. Citizen v. Dep't of Justice*, 491 U.S. 440 (1989).............................33

*Pulsifer v. United States*, 601 U.S. 124 (2024)........................................40

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639
    (2012)..........................................................................38

*Rop v. Fed. Hous. Fin. Agency*, 50 F.4th 562 (6th Cir. 2022) .......................... 53, 54

*Ryder v. United States*, 515 U.S. 177 (1995) ............................................. 55

*Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020) ............. 35, 42

*Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244 (9th Cir. 2024) (en banc) ....................................................... 58

*TRW Inc. v. Andrews*, 534 U.S. 19 (2001) ............................................ 40, 41, 42, 44

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) ............................................ 51, 52

*United States v. Bormes*, 568 U.S. 6 (2012) ............................................. 38

*United States v. Bundy*, 968 F.3d 1019 (9th Cir. 2020) ............................ 56, 59, 61

*United States v. Eaton*, 169 U.S. 331 (1898) ............................................ 53, 54

*United States v. Estate of Romani*, 523 U.S. 517 (1998) ................................... 39

*United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999) .................................... passim

*United States v. Giraud* (*Giraud Aug. 1 Op.*), No. 1:24-cr-768, 2025 WL 2196794 (D.N.J. Aug. 1, 2025) ................................................ 17, 61, 62

*United States v. Giraud* (*Giraud*), No. 1:24-cr-768, 2025 WL 2416737 (D.N.J. Aug. 21, 2025) ....................................................... passim

*United States v. Hansen*, 599 U.S. 762 (2023) ............................................. 34

*United States v. Hernandez-Garcia*, 44 F.4th 1157 (9th Cir. 2022) ...................... 39

*United States v. Huston*, 28 F.2d 451 (N.D. Ohio 1928) ................................... 59

*United States v. Rosenthal*, 121 F. 862 (C.C.S.D.N.Y. 1903) ............................. 59

*United States v. Struckman*, 611 F.3d 560 (9th Cir. 2010) ................................. 56

*United States v. Trump*, 740 F. Supp. 3d 1245 (S.D. Fla. 2024) ............... 56, 59, 61

*United States v. W.R. Grace*, 526 F.3d 499 (9th Cir. 2008) (en banc) ............ 24, 52

*United States v. Williams*, 65 F.R.D. 422 (W.D. Mo. 1974) ....................................59

**Statutes and Constitutional Provisions**

28 U.S.C. § 515 ......................................................................... 17, 23

28 U.S.C. § 541 ......................................................................... 23, 50, 51

28 U.S.C. § 542 .........................................................................23

28 U.S.C. § 546 ......................................................................... passim

28 U.S.C. § 547 ......................................................................... 50, 58

5 U.S.C. § 3345 ......................................................................... passim

5 U.S.C. § 3346 .........................................................................26

5 U.S.C. § 3347 ......................................................................... 26, 36

5 U.S.C. § 3348 .........................................................................60

5 U.S.C. § 3349a .........................................................................26

U.S. Const. amend. V .........................................................................57

U.S. Const. art. II, § 2, cl. 2 ......................................................................... passim

**Legislative Materials**

Act of Mar. 3, 1863, ch. 93, 12 Stat. 768 (1863) ....................................42

Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277, 112
    Stat. 2681 .........................................................................39

Federal Vacancies Reform Act, S. Rep. No. 105-250 (1998) .................................29

H.R. Rep. No. 110-58 (2007).........................................................................42

Legislative History Materials Regarding 2006 and 2007 Amendments
    to 28 U.S.C. § 546 ................................................................... 45, 46, 47, 48

Preserving United States Attorney Independence Act of 2007, Pub. L.
　　No. 110-34, 121 Stat. 224 ........................................................ 3, 24, 39, 47

USA PATRIOT Improvement and Reauthorization Act of 2005, Pub.
　　L. No. 109-177, 120 Stat. 192 ...................................................... 45

**Periodicals**

Ben Penn & Maia Spoto, *Trump's LA Prosecutor Orders Cases His
　　Staff Say Lack Evidence*, Bloomberg Law (updated July 29,
　　2025), https://news.bloomberglaw.com/us-law-week/trumps-la-
　　prosecutor-orders-cases-his-staff-say-lack-evidence ...................... 59

Brittny Mejia et al., *Trump Administration Maneuvers to Keep Essayli
　　as L.A.'s Top Federal Prosecutor*, L.A. Times (July 29, 2025),
　　https://perma.cc/S79U-A895 .................................................... 2, 14

Bruce A. Green & Rebecca Roiphe, *Depoliticizing Federal
　　Prosecution*, 100 Denv. L. Rev. 817 (2023) ................................... 42

Gabby Birenbaum, *Trump Names GOP Attorney Sigal Chattah as
　　Interim U.S. Attorney for Nevada*, Nev. Indep. (updated
　　Mar. 28, 2025), https://perma.cc/BFV3-9X6W .............................. 18

Isabella Aldrete, *Trump Extends Sigal Chattah's Term as US Attorney
　　Despite Opposition from Nevada Senators*, Nev. Indep. (July
　　29, 2025), https://perma.cc/D35W-GZSH ...................................... 19

Mark Robison, *Trump Appoints Chattah Acting US Attorney for
　　Nevada in Move that Blocks Judges*, Reno Gazette J. (July 30,
　　2025), https://perma.cc/5ASU-Y2SC .......................................... 19

Ross E. Wiener, *Inter-Branch Appointments After the Independent
　　Counsel: Court Appointment of United States Attorneys*, 86
　　Minn. L. Rev. 363 (2001) ......................................................... 42

Samuel L. Bray, *The Mischief Rule*, 109 Geo. L. J. 967 (2021) ............................. 44

Steve Sebelius, *Sigal Chattah Appointed as Acting U.S. Attorney
　　Amongst Qualification Concerns*, KTNV Las Vegas (updated
　　July 31, 2025), https://perma.cc/HN7T-5LHU ............................. 19

1    **Other Sources**

2    *Archives: Acting U.S. Attorney Daniel Hanlon*, U.S. Dep't of Justice
3         (last updated Mar. 17, 2025), https://perma.cc/6HP7-T4D5 ........................20

4    *Attorney General Pamela Bondi Appoints John A. Sarcone III as U.S.
          Attorney*, U.S. Dep't of Justice (updated Mar. 4, 2025),
5         https://perma.cc/M4JW-44D5 ........................................................20

6    *Bilal A. Essayli Sworn in as United States Attorney*, U.S. Dep't of
          Justice (updated Apr. 2, 2025), https://perma.cc/FR6U-PCTC....................14
7

8    *Black's Law Dictionary* (12th ed. 2024)........................................................32

9    Br. of Amici Former Republican Members of Congress, *United States
          v. Giraud*, No. 1:24-cr-768 (D.N.J. Aug. 13, 2025), Dkt. 138-2.................47
10

11   *Carla B. Freedman is Sworn in as United States Attorney for the
          Northern District of New York*, U.S. Dep't of Justice (updated
          Oct. 8, 2021), https://perma.cc/XP9D-BPCB................................................20
12

13   *Carla Freedman Concludes Her Service as United States Attorney*,
          U.S. Dep't of Justice (updated Feb. 17, 2025),
14        https://perma.cc/3ULB-UWYA......................................................20

15   Federal Rule of Criminal Procedure 7 ................................................................58

16   *Former United States Attorneys*, U.S. Dep't of Justice (updated
          Apr. 2, 2025), https://perma.cc/5RX9-BLBT................................................14
17

18   *Jason M. Frierson Sworn In as United States Attorney for the District
          of Nevada*, U.S. Dep't of Justice (updated May 11, 2022),
19        https://perma.cc/4DRG-R4SF....................................................18

20   Letters from John A. Sarcone III to Chief Judge Brenda K. Sannes and
          from Jewel Campos to John A. Sarcone III (July 14, 2025),
21        https://perma.cc/A4JR-Z86U......................................................21

22   *Meet the Acting U.S. Attorney*, U.S. Dep't of Justice (updated July 30,
          2025), https://perma.cc/TPS9-MHLV ................................................19
23

Memo. from Samuel A. Alito, Jr., to William P. Tyson (Nov. 13, 1986) ............................................................................................41

Mot. to Dismiss, *United States v. Garcia*, No. 2:25-cr-230 (D. Nev. Aug. 26, 2025), Dkt. 18-1............................................................19

Mot. to Dismiss, *United States v. Jackson*, No. 2:25-cr-240 (D. Nev. Aug. 26, 2025), Dkt. 21-1............................................................20

Mot. to Dismiss, *United States v. Salazar del Real*, No. 2:25-cr-227 (D. Nev. Aug. 26, 2025), Dkt. 21-1..........................................19

*News: United States Attorney for the Northern District of New York*, U.S. Dist. Ct. for the N.D.N.Y. (July 14, 2025), https://perma.cc/PTQ2-5JYQ ...............................................21

*Sigal Chattah Appointed Interim United States Attorney for the District of Nevada*, U.S. Dep't of Justice (updated Apr. 1, 2025), https://perma.cc/8ZWX-ESXS ...................................18

Statement of U.S. Attorney Geoffrey S. Berman on Appointment by Chief Judge, U.S. Dep't of Justice (updated Apr. 25, 2018), https://perma.cc/9DBM-7QA9 ........................................42

*Statement Regarding United States Attorney Ryan Ellison's Acting Appointment*, U.S. Dep't of Justice (updated Aug. 15, 2025), https://perma.cc/M9JS-R8GQ ......................................21

Stephen Migala, *The Vacancies Act and a Post-Vacancy First Assistant of USCIS* 20 (Sept. 9, 2019), https://perma.cc/A6M7-7PRJ .............................................................................29

*Sue Fahami Named Acting United States Attorney for the District of Nevada*, U.S. Dep't of Justice (updated Jan. 21, 2025), https://perma.cc/FK9E-568L ........................................18

*U.S. Attorney Alexander Uballez to Step Down, Concluding Impactful Tenure in New Mexico*, U.S. Dep't of Justice (updated Feb. 18, 2025), https://perma.cc/3A4S-4NB6 ..........................21

U.S. Dep't of Just., Justice Manual.................................................. 51, 58

*United States Attorney Jason M. Frierson Announces Resignation*,
        U.S. Dep't of Justice (updated Dec. 30, 2024),
        https://perma.cc/9S7X-M7AV........................................................................18

# FACTUAL BACKGROUND

**The administration appoints Mr. Essayli on an interim basis, then purports to direct him to serve on an acting basis.**

Martin Estrada, the most recent Senate-confirmed U.S. Attorney for the Central District of California, resigned on January 17, 2025.[4]  From that date until April 1, then-first assistant Joseph McNally served as acting U.S. Attorney.  *Id.*

Effective April 2, the Attorney General appointed Bilal Essayli as interim U.S. Attorney under 28 U.S.C. § 546(a).[5]  The President did not submit Mr. Essayli as a nominee for Senate confirmation, and under § 546(c)(2), his service expired after 120 days on July 30.  Public reports indicated that the judges of this district declined to make an appointment under § 546(d), but there was no order or announcement.[6]

Seeking to avoid the expiration of Mr. Essayli's term, the government undertook a four-step maneuver on July 29:

First, the Attorney General appointed Mr. Essayli as "a Special Attorney," citing "the authority vested in the Attorney General by law, including 28 U.S.C. § 509, 510, and 515."  Ex. 1, at 1.

Second, the Attorney General appointed Mr. Essayli as first assistant

---

[4]  *See Former United States Attorneys*, U.S. Dep't of Justice (updated Apr. 2, 2025), https://perma.cc/5RX9-BLBT.

[5]  *Bilal A. Essayli Sworn in as United States Attorney*, U.S. Dep't of Justice (updated Apr. 2, 2025), https://perma.cc/FR6U-PCTC.

[6]  Mejia, *Trump Administration Maneuvers*, *supra*, https://perma.cc/S79U-A895.

U.S. Attorney for the Central District of California, "effective upon his resignation as United States Attorney."  *Id.*

Third, Mr. Essayli purported to "resign my position as Interim United States Attorney for the Central District of California."  Ex. 2, at 1.  Yet in the very next (and only other) sentence of his resignation letter, he announced that he "look[s] forward to continuing to lead the U.S. Attorney's Office for the Central District of California."  *Id.*

Fourth, the Attorney General ordered that, as first assistant, "Mr. Essayli will have authority to serve as Acting United States Attorney upon a vacancy in that office, subject to the conditions and limitations of the Federal Vacancy Reform Act of 1999."  Ex. 1, at 1.

The government has offered no evidence—and there have been no public reports—of any appointment or designation made by the President directly.

**The administration has pursued similar maneuvers in at least four other districts.**

Mr. Essayli's purported installment as acting U.S. Attorney follows a pattern of improper appointments to that role across at least four other districts.

### 1.  District of New Jersey.

As noted above, only the District of New Jersey has so far weighed in on a similar U.S. Attorney designation.  The facts in this section are derived from the

district court's August 21 opinion in those proceedings—cited herein as *Giraud*.[7]

Philip Sellinger was the last Senate-confirmed U.S. Attorney for the District of New Jersey. *Id.* at *1–2. Mr. Sellinger resigned from the position effective January 8, 2025. *Id.* at *2 & n.5, *28. As a result of the vacancy, Vikas Khanna—who was then serving as the first assistant U.S. Attorney—automatically became the acting U.S. Attorney under the Federal Vacancies Reform Act, 5 U.S.C. § 3345(a)(1). *Id.* at *2 & n.6, *28.

On March 3, the administration appointed John Giordano as interim U.S. Attorney under 28 U.S.C. § 546(a). *Id.* at *2 & n.7, *28. On March 28, the administration replaced Mr. Giordano and appointed Alina Habba as interim U.S. Attorney under § 546(a). *Id.* at *2 & nn.8–10, *28. The administration nominated her for the permanent U.S. Attorney position on June 30. *Id.* at *2 & n.13.

With Ms. Habba's term under § 546(a) nearing its anticipated end, on July 22, the judges of the district appointed Desiree Grace, who was then the first assistant U.S. Attorney, as the interim U.S. Attorney under § 546(d). *Id.* at *2 & n.16, *28. The same day, the administration fired Ms. Grace, at least from her position as first assistant. *Id.* at *3 & nn.21–22. On July 24, the administration took the following five actions:

1. Had Ms. Habba purport to resign as interim U.S. Attorney;

---

[7]   *United States v. Giraud*, No. 1:24-cr-768, 2025 WL 2416737 (D.N.J. Aug. 21, 2025) (Brann, C.J., sitting by designation), Dkt. 144, *appeal docketed*, Nos. 25-2635, -2636 (3d Cir. Aug. 25, 2025).

2.  Appointed Ms. Habba as special attorney under 28 U.S.C. § 515;

3.  Withdrew Ms. Habba's nomination for the permanent position;

4.  Designated Ms. Habba the first assistant U.S. Attorney; and

5.  Thereby purported to have Ms. Habba automatically elevated to acting U.S. Attorney under 5 U.S.C. § 3345(a)(1).

*Giraud*, 2025 WL 2416737, at *3 & nn.24–29, *28.

Many defendants challenged Ms. Habba's authority, including by motions filed in the two cases recently addressed by Chief Judge Brann (M.D. Pa.), sitting by designation.  He has issued two relevant decisions:  First, an August 1 opinion that assumed for the sake of argument that Ms. Habba was not lawfully serving and discussed the remedies that might be available to the defendants in *United States v. Giraud*, No. 1:24-cr-768 (the "*Giraud Aug. 1 Op.*").[8]  Second, the August 21 opinion ("*Giraud*") that ruled on the merits of Ms. Habba's of unlawful acting service and determined the remedies for the *Giraud* defendants and for the defendant in *United States v. Pina*, No. 2:25-cr-436.[9]

The Court concluded that Ms. Habba "has exercised the functions and duties of the Office of the United States Attorney for the District of New Jersey without lawful authority since July 1, 2025." *Giraud*, 2025 WL 2416737, at *1.  Her interim appointment by the Attorney General under § 546(a) expired on that

_____

[8]  *United States v. Giraud* (*Giraud Aug. 1 Op.*), No. 1:24-cr-768, 2025 WL 2196794 (D.N.J. Aug. 1, 2025), Dkt. 116.

[9]  *United States v. Giraud* (*Giraud*), No. 1:24-cr-768, 2025 WL 2416737 (D.N.J. Aug. 21, 2025), Dkt. 144.

date, *id.* at *12, and she is not eligible for FVRA acting service under § 3345's statutory criteria, *id.* at *13–19. The Court voided the *Pina* indictment, which Ms. Habba had signed without authority. *Id.* at *27. It declined to dismiss either indictment, but it disqualified Ms. Habba and any attorneys acting under her supervision from participation in either prosecution. *Id.* at *26–27, *30.

### 2. District of Nevada.

Jason M. Frierson was the last Senate-confirmed U.S. Attorney for the District of Nevada.[10] He resigned from the position effective January 17, 2025.[11] Following Mr. Frierson's resignation, on or about January 21, first assistant U.S. Attorney Sue Fahami began serving as the acting U.S. Attorney under § 3345.[12]

On or about March 28, the administration designated Sigal Chattah as interim U.S. Attorney under § 546(a), and she was sworn in on April 1.[13] On information and belief, on or about July 28, the administration pursued a series of personnel maneuvers and ultimately purported to designate Ms. Chattah to serve

---

[10] *See Jason M. Frierson Sworn In as United States Attorney for the District of Nevada*, U.S. Dep't of Justice (updated May 11, 2022), https://perma.cc/4DRG-R4SF.

[11] *United States Attorney Jason M. Frierson Announces Resignation*, U.S. Dep't of Justice (updated Dec. 30, 2024), https://perma.cc/9S7X-M7AV.

[12] *Sue Fahami Named Acting United States Attorney for the District of Nevada*, U.S. Dep't of Justice (updated Jan. 21, 2025), https://perma.cc/FK9E-568L.

[13] *See Sigal Chattah Appointed Interim United States Attorney for the District of Nevada*, U.S. Dep't of Justice (updated Apr. 1, 2025), https://perma.cc/8ZWX-ESXS; Gabby Birenbaum, *Trump Names GOP Attorney Sigal Chattah as Interim U.S. Attorney for Nevada*, Nev. Indep. (updated Mar. 28, 2025), https://perma.cc/BFV3-9X6W.

as acting U.S. Attorney for the district under § 3345.[14]  The defense is unaware of the details of the specific steps that led to this result.  Some reports have indicated Ms. Chattah purported to submit her resignation as interim U.S. Attorney to the administration on or about July 28.[15]  The Department of Justice's website indicates Ms. Chattah was contemporaneously appointed as special attorney to the Attorney General.[16]  The defense is unaware of Ms. Chattah having ever been designated the first assistant U.S. Attorney in the district; on information and belief, Ms. Fahami has consistently served in that role during the relevant periods.  The defense is likewise unaware of President Trump himself having specifically designated Ms. Chattah to serve as the acting U.S. Attorney.

On August 26, three Nevada defendants challenged Ms. Chattah's appointment, moving for dismissal and disqualification.  Mot. to Dismiss, *United States v. Salazar del Real*, No. 2:25-cr-227 (D. Nev. Aug. 26, 2025), Dkt. 21-1; Mot. to Dismiss, *United States v. Garcia*, No. 2:25-cr-230 (D. Nev. Aug. 26, 2025), Dkt. 18-1; Mot. to Dismiss, *United States v. Jackson*, No. 2:25-cr-240 (D.

---

[14] *See* Isabella Aldrete, *Trump Extends Sigal Chattah's Term as US Attorney Despite Opposition from Nevada Senators*, Nev. Indep. (July 29, 2025), https://perma.cc/D35W-GZSH.

[15] Mark Robison, *Trump Appoints Chattah Acting US Attorney for Nevada in Move that Blocks Judges*, Reno Gazette J. (July 30, 2025), https://perma.cc/5ASU-Y2SC; Steve Sebelius, *Sigal Chattah Appointed as Acting U.S. Attorney Amongst Qualification Concerns*, KTNV Las Vegas (updated July 31, 2025), https://perma.cc/HN7T-5LHU.

[16] *See Meet the Acting U.S. Attorney*, U.S. Dep't of Justice (updated July 30, 2025), https://perma.cc/TPS9-MHLV.

Nev. Aug. 26, 2025), Dkt. 21-1.

**3. Northern District of New York.**

Carla B. Freedman was the last Senate-confirmed U.S. Attorney for the Northern District of New York.[17]  She resigned from the position effective February 17, 2025.[18]  At that point, Daniel Hanlon—the first assistant U.S. Attorney—began serving as the acting U.S. Attorney under § 3345.[19]

On March 4, the administration appointed John A. Sarcone III as interim U.S. Attorney under § 546(a), and he began serving in that role on March 17.[20] The President did not submit Mr. Sarcone as a nominee for Senate confirmation, and under § 546(c)(2), Mr. Sarcone's service was set to expire on July 15, 2025.

That expiration would have triggered the district court's authority to appoint an interim U.S. Attorney under § 546(d), but the district judges announced on July 14 that they "decline[] to exercise" that appointment

---

[17] *See Carla B. Freedman is Sworn in as United States Attorney for the Northern District of New York*, U.S. Dep't of Justice (updated Oct. 8, 2021), https://perma.cc/XP9D-BPCB.

[18] *Carla Freedman Concludes Her Service as United States Attorney*, U.S. Dep't of Justice (updated Feb. 17, 2025), https://perma.cc/3ULB-UWYA.

[19] *See Archives: Acting U.S. Attorney Daniel Hanlon*, U.S. Dep't of Justice (last updated Mar. 17, 2025), https://perma.cc/6HP7-T4D5.

[20] *See Attorney General Pamela Bondi Appoints John A. Sarcone III as U.S. Attorney*, U.S. Dep't of Justice (updated Mar. 4, 2025), https://perma.cc/M4JW-44D5.

authority.[21]  The administration purported to designate Mr. Sarcone both as special attorney to the Attorney General and as the first assistant U.S. Attorney, thereby purporting to have Ms. Sarcone automatically elevated to acting U.S. Attorney under § 3345(a)(1).[22]

### 4. District of New Mexico.

The most recent Senate-confirmed U.S. Attorney for the District of New Mexico was Alexander M.M. Uballez, who retired on February 17, 2025, at the President's direction.[23]  Upon his resignation, then-first assistant Holland S. Kastrin became acting U.S. Attorney under § 3345.  *See id.*

On April 17, the Attorney General appointed Ryan Ellison as the interim U.S. Attorney for the district under § 546(a).[24]  Under § 546(c)(2), that appointment expired on August 15.  At that point, according to the government, Mr. Ellison began serving as the acting U.S. Attorney "at the request of the Attorney General."  *Id.*  The administration has not identified the statutory

---

[21] *News: United States Attorney for the Northern District of New York*, U.S. Dist. Ct. for the N.D.N.Y. (July 14, 2025), https://perma.cc/PTQ2-5JYQ.

[22] *See* Letters from John A. Sarcone III to Chief Judge Brenda K. Sannes and from Jewel Campos to John A. Sarcone III (July 14, 2025), https://perma.cc/A4JR-Z86U.

[23] *See U.S. Attorney Alexander Uballez to Step Down, Concluding Impactful Tenure in New Mexico*, U.S. Dep't of Justice (updated Feb. 18, 2025), https://perma.cc/3A4S-4NB6.

[24] *See Statement Regarding United States Attorney Ryan Ellison's Acting Appointment*, U.S. Dep't of Justice (updated Aug. 15, 2025), https://perma.cc/M9JS-R8GQ.

1    authority for that service and has not indicated that the President made the

2    designation.  There has been no indication that Mr. Ellison has been named first

3    assistant U.S. Attorney or special attorney to the Attorney General.

4    **Under Essayli's supervision, the government secures an indictment
     against Mr. Garcia.**

5

6           Mr. Garcia was arrested on July 29, 2025, following a complaint approved

7    on July 7 by Magistrate Judge Stevenson.  Dkt. 1, 7.  According to the affidavit

8    filed in support of the complaint, on June 18, 2025, Manhattan Beach Police

9    Department officers responded to a report of an individual with a firearm sleeping

10   in his car near a CVS.  Dkt. 1, at 3 (¶ 8).  The government alleges that the

11   individual was Mr. Garcia and that, after he exited the car, officers found a

12   firearm and ammunition inside.  *Id.* at 3–4 (¶¶ 8–10).

13          On August 8, a grand jury charged Mr. Garcia with one count of unlawful

14   possession of ammunition under 18 U.S.C. § 922(g)(1) and one count of

15   possession of a machinegun under 18 U.S.C. § 922(o)(1), both stemming from

16   that June 18 encounter.  Dkt. 13, at 1–3.  Mr. Essayli appears at the top of the

17   indictment's signature block, above the title "Acting United States Attorney," and

18   Assistant United States Attorney Frances S. Lewis affixed her signature below.

19   *Id.* at 5.

20          As described in the accompanying declaration, on August 27 and 28, 2025,

21   the parties met and conferred, thoroughly discussing the substance of this

22   anticipated motion and any potential resolution.  The parties were able to clarify

23   and narrow some of the issues, and the remaining disputes are set forth below.

# LEGAL BACKGROUND

This motion involves the interplay between two statutes: 28 U.S.C. § 546, which governs U.S. Attorney vacancies specifically; and 5 U.S.C. § 3345, which governs Executive Branch vacancies generally.

## I.    28 U.S.C. § 546: Interim Appointment by Attorney General or District Court.

Section 541 establishes the position of United States Attorney.[25]  That section sets the default rule that U.S. Attorneys must receive Presidential appointment and Senate confirmation (commonly referred to as a "PAS" position).  Specifically, under subsection (a), "The President shall appoint, by and with the advice and consent of the Senate, a United States attorney for each judicial district."

Section 546 covers U.S. Attorney vacancies.  The statute allows the Attorney General to make an interim appointment: under subsection (a), "the Attorney General may appoint a United States attorney for the district in which the office of United States attorney is vacant."  Individuals serving as interim U.S. Attorneys are "fully-empowered United States Attorneys" as opposed to

---

[25] Other sections authorize appointments to other Department positions, some of which do not require Senate confirmation.  Under § 542, for instance, the Attorney General may appoint assistant United States attorneys—the line prosecutors of the federal system.  Under § 515, a Department of Justice attorney (including a specially appointed attorney) "may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings . . . which United States attorneys are authorized by law to conduct."

"subordinates assuming the role of 'Acting' United States Attorney." *United States v. Gantt*, 194 F.3d 987, 999 n.5 (9th Cir. 1999), *overruled on other grounds by United States v. W.R. Grace*, 526 F.3d 499, 506 (9th Cir. 2008) (en banc).

The Attorney General's § 546(a) appointment authority is time-limited. Under subsection (c), an interim U.S. Attorney may serve no later than for "120 days after appointment by the Attorney General." This 120-day limit was added to the statute in 2007. Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224, 224. As detailed below (at 44), it was specifically designed to address concerns that presidential administrations were improperly using interim U.S. Attorney appointments to avoid the Senate's constitutional advice-and-consent function.

When an Attorney General's § 546(a) appointment expires, the authority to appoint an interim U.S. Attorney shifts to the judges of the district court under § 546(d). An interim U.S. Attorney appointed by the district court under subsection (d) may "serve until the vacancy is filled."

## II.    5 U.S.C. § 3345: Acting Service Under the Federal Vacancies Reform Act.

The Federal Vacancies Reform Act deals with executive branch vacancies more generally and imposes its own limits on the duration and duties of acting federal service. *See* 5 U.S.C. §§ 3345–3349e.

Section 3345(a) instructs that a vacancy arises for FVRA purposes when an "officer … whose appointment to office is required to be made by the President,

by and with the advice and consent of the Senate, dies, resigns, or is otherwise unable to perform the functions and duties of the office." Such an "inability" includes "the expiration of a term of office." *Id.* § 3345(c)(2).

The FVRA provides three options for filling a position on an acting basis. *Id.* § 3345(a)(1)–(3).

The first (and default) rule: an already-in-place first assistant can become the acting officer. Under subsection (a)(1), the first assistant in the office "shall perform the functions and duties of the office temporarily in an acting capacity." This provision "fills the role automatically." *Hooks v. Kitsap Tenant Support Services, Inc.*, 816 F.3d 550, 557 (9th Cir. 2016); *see also NLRB v. SW General, Inc.*, 580 U.S. 288, 296 (2017) (describing this as the "general rule"). As explained below (at 29), for this "first assistant" provision to apply, the relevant individual must have been serving as first assistant when the vacancy occurred.

The other two options are exceptions to that default rule: there are "two ways the President may override the automatic operation of" this provision and instead select someone other than the then-first assistant. *Hooks*, 815 F.3d at 557.

One of those exceptions: under subsection (a)(2), "the President (and only the President)" can select another individual as the acting officer, if that other individual is already serving in another office that requires appointment and confirmation.

The other exception: under subsection (a)(3), "the President (and only the President)" can select another senior government leader as the acting officer if the individual satisfies three conditions. The individual must be currently serving as

an executive branch officer or employee in the same agency. The individual must have served in a position in that agency for at least 90 days within the 365-day period preceding the vacancy. And that position must have had a rate of pay equal or greater than the rate provided in the GS-15 scale.

However the acting officer is selected, the statutory scheme limits the time of that acting service. Under § 3346(a)(1), an acting officer may serve until no later than 210 days after the date the vacancy occurs. Under § 3349a(b), if the vacancy exists when a new incoming President is inaugurated, the period is extended, and the individual may serve until 300 days after inauguration day. If the President submits a nomination to the Senate, the acting official's term can be enlarged as that process plays out. *See id.* § 3346(a)(2), (b).

The FVRA also provides a remedy for improperly appointed individuals: nullification. Section 3347(d)(1) provides that "[a]n action taken by any person who is not" properly serving as an acting officer "in the performance of any function or duty of a vacant office … shall have no force or effect." Under subsection (2), such actions "may not be ratified" later. This "Ratification Bar … applies only to those duties of an officer that are nondelegable." *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S. Dep't of Homeland Sec.*, 107 F.4th 1064, 1073 (9th Cir. 2024).

## ARGUMENT

Mr. Essayli is improperly serving as a non-confirmed U.S. Attorney at least thrice over.

*First*, Mr. Essayli satisfies none of the criteria to be an appropriate "acting"

official under the FVRA.  He was (1) not an already-in-place first assistant; (2) not a Senate-confirmed officer in another role; and (3) not an already-in-place senior official in the U.S. Attorney's Office.  So Mr. Essayli is not a proper FVRA "acting" officer.  His actions thus have no force or effect.

*Second*, and alternatively, Mr. Essayli cannot continue serving as U.S. Attorney in any capacity after he exhausted the 120-day clock under § 546(c)(2). That more-specific 120-day limit controls over the FVRA's general-purpose provisions here—a reality confirmed by at least three statutory interpretation principles (specific-over-general, the presumption-against-surplusage canon, and the "mischief" rule).  Once the administration appoints someone for interim service under § 546(a), that 120-day clock controls, even if that individual is later re-designated for acting service under the FVRA.  Because Mr. Essayli's 120-day clock expired on July 30, his actions since that date have been taken without lawful authority.

*Third*, even if Mr. Essayli's purported acting service somehow technically complied with the statutes, the particular maneuvers here would raise fatal Appointments Clause problems.  U.S. Attorneys exercise sufficient power to be principal officers for constitutional purposes, thus requiring Senate confirmation. And despite Mr. Essayli's acting label, the administration is attempting to capture essentially all that power by extending his term, potentially indefinitely.  If the administration's statutory reading is right—meaning that Mr. Essayli can serve notwithstanding the statutory limits Congress imposed on temporary service— then he must be confirmed by the Senate before he can lawfully act as

U.S. Attorney.

Under whatever framing, Mr. Essayli cannot legally exercise the duties of the U.S. Attorney.  The indictment here was secured under Mr. Essayli's name and supervision as an improperly designated acting U.S. Attorney.  It is therefore void and should be dismissed with prejudice.  At a minimum, Mr. Essayli and all those under his supervision should be disqualified from participating in criminal prosecutions in this district.

## I. Mr. Essayli is not lawfully serving as U.S. Attorney.

### I.A. Mr. Essayli is not an eligible acting officer under 5 U.S.C. § 3345.

Mr. Essayli cannot serve as an acting officer under § 3345, because he does not meet any of the three statutory eligibility requirements.  He did not meet those requirements when the vacancy arose for FVRA purposes upon Mr. Estrada's January 17 resignation.  Although Mr. Essayli purported to resign his interim role on July 29, that action did not create a new qualifying vacancy for FVRA purposes, and he remains ineligible.

#### I.A.1. Mr. Essayli is not eligible to fill the January 17 FVRA vacancy.

A vacancy occurred for FVRA purposes on January 17 when Mr. Estrada resigned as the Senate-confirmed U.S. Attorney.  *See* 5 U.S.C. § 3345(a).  But Mr. Essayli is not eligible to serve as an acting officer to fill that vacancy.  The administration has three options to direct someone to serve as an acting officer under § 3345(a), but the statute expressly closes off each of those paths as to

Mr. Essayli.

**Subsection (a)(1).**  Mr. Essayli was not already serving as first assistant U.S. Attorney at the time of the vacancy.  Under subsection (a)(1)—the default rule—the first assistant to the newly vacant office automatically becomes the acting officer.  But Mr. Essayli was not the first assistant U.S. Attorney on January 17—Mr. McNally was—and Mr. Essayli is therefore ineligible to serve as acting U.S. Attorney under subsection (1).

The Attorney General purported to designate Mr. Essayli as the first assistant on July 29, but that did not render him eligible for active service.  Rather, for subsection (1) to operate, the individual "must be the first assistant at the time the vacancy occurs."  *Giraud*, 2025 WL 2416737, at *14; *see also L.M.-M. v. Cuccinelli*, 442 F. Supp. 3d 1, 28 (D.D.C. 2020) (expressing "doubt on whether Congress intended the phrase 'first assistant' to encompass those appointed to the first-assistant position after the vacancy arose").[26]

That contemporaneity requirement—service as the first assistant at the time of the vacancy—is "convincingly" indicated by the "statutory framework" for at least two reasons.  *Giraud*, 2025 WL 2416737, at *14.  First, subsection (1)

---

[26] *See also* Stephen Migala, *The Vacancies Act and a Post-Vacancy First Assistant of USCIS* 20 (Sept. 9, 2019), https://perma.cc/A6M7-7PRJ ("Critically, the precise question of whether the first assistant to a PAS office can be installed post-vacancy was answered in the negative."); Federal Vacancies Reform Act, S. Rep. No. 105-250, at 14–15 (1998) ("This provision allows the office to be temporarily filled by 'the person' who was originally eligible to be the acting officer at the time the vacancy arose."); *id.* at 12–13, 21, 34 (similar).

"function[s] in a simple if-then form": "the promotion of the first assistant occurs automatically at the moment of the vacancy." *Id.* As a result, there is "no textual indication that the President has any choice in invoking the first assistant provision, nor that it is meant to trigger at any time other than the moment the vacancy occurs." *Id.*

Second, allowing an administration to name its own first assistant post-vacancy and then turn that person into the acting officer "would render the limits in subsections (a)(2) and (a)(3) surplusage in the vast majority of cases." *Id.* at *15. "Those provisions set a very high bar for the President's options for a non-first-assistant acting official." *Id.* "But if the President may simply name anyone as the first assistant at any time and thereby vest them with acting powers, these limitations on acting service are rendered entirely irrelevant." *Id.* The statute is better read to avoid these issues: only an already-serving first assistant can assume the acting title under § 3345(a)(1)—not one named after the vacancy. *Id.*

**Subsection (a)(2).** Under subsection (a)(2), the President can alternatively designate for acting service any individual already serving in some other office that requires Senate confirmation. But Mr. Essayli has never been nominated and confirmed to any such office, and he is therefore ineligible for acting service under § 3345(a)(2).

**Subsection (a)(3).** Under subsection (a)(3), the President can alternatively designate for acting service another agency officer or employee if that individual worked in the relevant for at least 90 days during the 365 days preceding the

vacancy and was paid at a rate equal to or greater than GS-15. But Mr. Essayli
was a state legislator until April 2025, not a federal officer or employee, and is
therefore ineligible for acting service under § 3345(a)(3).

### I.B.    There was no qualifying vacancy in July.

Measured from the January 17 FVRA vacancy, none of the three statutory
paths is open to Mr. Essayli. The Attorney General indicated that Mr. Essayli's
purported resignation on July 29 would create a new vacancy and that his
designation as first assistant U.S. Attorney would enable him to fill that vacancy
under the FVRA. Ex. 1, at 1.

That contention fails for three independent reasons: (1) only resignations of
Senate-confirmed officers create a qualifying FVRA vacancy; (2) there was no
bona fide resignation here; and (3) any resignation means that Mr. Essayli was
not an eligible employee of the relevant executive agency when designated for
acting service.

*First*, under § 3345(a), the resignation of an acting, interim, or other
temporary officer is insufficient to create a vacancy for FVRA purposes. Rather,
a resignation triggers an FVRA vacancy only if the resigning official was Senate-
confirmed. 5 U.S.C. § 3345(a) (making vacancy contingent on resignation of "an
officer … whose appointment to office is required to be made by the President, by
and with the advice and consent of the Senate").

"[T]he person whose 'vacancy' brings the [statute] into operation must
have ascended to the post through a Presidential appointment," as opposed to a
temporary assignment. *Doolin Sec. Sav. Bank v. Office of Thrift Supervision*, 139

F.3d 203, 208 (D.C. Cir. 1998) (interpreting the pre-1998 version of the statute), *superseded by statute on other grounds as recognized in Jooce v. FDA*, 981 F.3d 26, 28 (D.C. Cir. 2020).[27]  "Otherwise," the time limitations on acting service "could be easily avoided by a series of temporary replacements followed by resignations, with each resignation triggering a new" acting officer designation. *Id.*  In his role as interim U.S. Attorney, Mr. Essayli was not Senate-confirmed, so his purported resignation from that role did not create an FVRA vacancy.

     *Second*, even assuming an interim U.S. Attorney's bona fide resignation could in the abstract create a qualifying FVRA vacancy under § 3345(a), there was no such bona fide resignation here.  His resignation letter—signed as part of a maneuver to extend rather than relinquish his temporary service—was not bona fide.

     The verb "resign" means to "surrender," "[t]o formally announce one's decision to leave a job or an organization."  *Black's Law Dictionary* (12th ed. 2024).  To genuinely resign from an office, the individual must actually surrender the duties of the office, at least for the foreseeable future.  An individual is not

---

[27] *See also Olympic Fed. Sav. & Loan Ass'n v. Dir., Off. of Thrift Supervision*, 732 F. Supp. 1183, 1195 (D.D.C. 1990) (concluding the term "officer" in the pre-1998 version of the statute means "constitutional officer," namely "an officer selected by the President with the advice and consent of the Senate") (cleaned up), *appeal dismissed and remanded*, 903 F.2d 837 (D.C. Cir. 1990). *Doolin* reached at least two additional holdings regarding the statutory scheme; in 1998, Congress amended the statutes to override those additional holdings. *See, e.g.*, *Gonzales*, 107 F.4th at 1094 (Christen, J., dissenting).  But nothing in the statutory amendments altered *Doolin*'s conclusion that a vacancy under § 3345 occurs only when a Senate-confirmed individual leaves office.

"resigning" in any meaningful sense when, rather than surrender his duties, he purports to extend them to a materially indistinguishable role.  But that is precisely what happened here: in one breath, Mr. Essayli "resign[ed] his position" as interim U.S. Attorney and, in the very next, "look[ed] forward to continuing to lead the U.S. Attorney's Office."  Ex. 2, at 1.[28]  The Court should reject any suggestion that this constituted a bona fide resignation for FVRA purposes.

A contrary understanding of the term "resignation" would lead to absurd results.  "[W]ell-accepted rules of statutory construction caution us that statutory interpretations which would produce absurd results are to be avoided."  *Ariz. State Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006).  Likewise, courts should not interpret a statute to frustrate clear legislative intent.  *E.g.*, *Pub. Citizen v. Dep't of Justice*, 491 U.S. 440, 455-65 (1989).  If the resignation of a temporary officer were understood to create a vacancy under § 3345(a), and if a mere technical resignation counted as a true resignation under the statute, then the administration could allow the temporary officer to serve as the acting officer indefinitely, merely by having the individual repeatedly resign and get re-designated.  Under that view, the relevant time limitations on acting service—and the need for a permanent nominee to receive Senate confirmation— "could be easily avoided."  *Doolin*, 139 F.3d at 208.

*Third*, even if Mr. Essayli had tendered a bona fide resignation and created

---

[28] In New Jersey, Ms. Habba took the same approach using the same language. *United States v. Giraud*, No. 1:24-cr-768 (D.N.J. filed July 29, 2025), Dkt. 108-4.

a qualifying FVRA vacancy, he would still not be eligible for acting service. Once that vacancy arose, he was not at that point serving as the first assistant or in a Senate-confirmed position. *See* 5 U.S.C. § 3345(a)(1), (2). Nor was he serving as "an officer or employee" of the U.S. Attorney's Office or any other executive agency; he was a private citizen. *See id.* § 3345(a)(3).

*　　*　　*

Were there any doubt on these three questions of statutory interpretation, the Court should apply the canon of constitutional avoidance and resolve those questions against Mr. Essayli's continued temporary service without Senate confirmation. *See, e.g.*, *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (discussing the canon); *United States v. Hansen*, 599 U.S. 762, 781 (2023) ("When legislation and the Constitution brush up against each other, our task is to seek harmony, not to manufacture conflict."). As explained below (at 49), a contrary reading of the statute would pose serious concerns under both the Appointments Clause and separation of powers principles by allowing the Executive Branch to circumvent the constitutional requirements of advice and consent from a co-equal branch of government.[29] The Court should refuse to read the statute in a manner likely to render it unconstitutional.

---

[29] *See, e.g.*, *Freytag v. Comm'r*, 501 U.S. 868, 878, 880 (1991) (noting these types of challenges go to "the Constitution's structural integrity" and "the entire Republic" because they reflect one branch attempting to "aggrandiz[e] its power at the expense of another branch" and thereby "diffus[e] the appointment power"); *Giraud*, 2025 WL 2416737, at *5 & nn.47, 58 (citing *Freytag*).

1    The constitutional concerns are heightened because the administration's

2    maneuvers are novel, particularly the designation of Mr. Essayli as a "special

3    attorney."  Although "Attorneys General [have] made extensive use of special

4    attorneys," *In re Persico*, 522 F.2d 41, 54 (2d Cir. 1975), the administration's

5    simultaneous efforts in this and the aforementioned judicial districts appear to be

6    the first instance of an Attorney General using the limited special-attorney

7    appointment authority in 28 U.S.C. § 515 (or its predecessors) to purport to install

8    a special attorney to the office of a U.S. Attorney wholesale.  *See Seila Law LLC*

9    *v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 220 (2020) ("Perhaps the most

10   telling indication of a severe constitutional problem with an executive entity is a

11   lack of historical precedent to support it.") (cleaned up).  The administration is

12   attempting a novel maneuver—self-described as a trick—that contravenes the text

13   of the governing statutes and poses grave constitutional concerns.  That attempt

14   should be rejected.

15   **I.C.     The President did not designate Mr. Essayli for acting**

16   **service.**

17   If the President seeks to designate an eligible person other than the first

18   assistant for acting service under the FVRA, "the President (and only the

19   President)" must give the direction.  5 U.S.C. § 3345(a)(2), (3); *accord Hooks*,

20   816 F.3d at 557.  But the President did not do so here: only the Attorney General

21   purported to name Mr. Essayli to the roles he claims to hold.  *See* Ex. 1, at 1.

22

23

1    **I.D.    Mr. Essayli's designation as a special attorney cannot**

2    **displace the FVRA's limits.**

3    Nor does the Attorney General's designation of Mr. Essayli as a special

4    attorney entitle him to act as the U.S. Attorney or prosecute this matter.  As the

5    *Giraud* Court explained, the government's "'Special Attorney' theory crashes

6    headlong into th[e] unambiguous barring provision" of the FVRA.  2025 WL

7    2416737, at *22 (citing 5 U.S.C. § 3347).  As a special attorney, Mr. Essayli

8    purports to have the authority to perform all the functions and duties of a properly

9    appointed and confirmed U.S. Attorney, but "[t]hat is exactly what

10    section 3347(b) prohibits."  *Id.*  Whatever authority the Department's organic

11    statutes confer on the Attorney General to make special-attorney designations,

12    they do not permit her to circumvent the FVRA's limits, including statutory

13    eligibility and personal designation by the President.  "The general vesting and

14    delegation provisions that exist for every department head in the Executive do not

15    create alternative paths for authorizing someone to temporarily perform those

16    functions and duties.  Section 3347(b) thus precludes the Special Attorney

17    argument in its entirety."  *Id.*

18    **II.    Even if Mr. Essayli were eligible under 5 U.S.C. § 3345, he has**

19    **exhausted the 120-day clock at 28 U.S.C. § 546(c)(2).**

20    Even if the FVRA could be interpreted to authorize Mr. Essayli's acting

21    designation, it would nevertheless independently be barred by § 546(c)(2)'s 120-

22    day limit on temporary service as the U.S. Attorney.  That statute sets a maximum

23    term specific to the office of the U.S. Attorney, and the government cannot

invoke the FVRA's more general timelines to tack additional days onto § 546(c)(2)'s specific limit.

At least three rules of statutory interpretation confirm as much: (1) the specific-over-general canon; (2) the presumption against surplusage; and (3) the "mischief" rule. This section addresses each in turn.

### II.A.   A non-confirmed U.S. Attorney designated under § 546(a) cannot serve more than 120 days.

This motion assumes for the sake of argument that an administration can choose to designate a temporary U.S. Attorney under either vacancies regime: for interim service under the office-specific authority at § 546(a) or for acting service under the general FVRA authority at § 3345(a).[30]

If the administration chooses to designate an interim U.S. Attorney under § 546(a), however, it is stuck with the limitations Congress imposed on that service—including the 120-day clock at § 546(c)(2). Mr. Essayli is indisputably a "person appointed as United States attorney under this section," 28 U.S.C. § 546(c), so he "may serve" no longer than "120 days after appointment by the Attorney General under this section," *id.* § 546(c)(2). Nothing in the statute

---

[30] The defense preserves for further review the argument that § 546(a), as the more specific statute, provides the exclusive means for designating an individual for temporary service as the U.S. Attorney. The government may contend that this question is controlled by *Hooks*' holding the FVRA authority co-exists with the office-specific provision for temporary service as General Counsel of the National Labor Relationship Board. 816 F.3d at 556. To the extent the Court concludes that *Hooks* forecloses this argument, the defense contends that *Hooks* was incorrectly decided and should be revisited.

resets that clock or relieves Mr. Essayli from its consequences if his service is later given some other label, like an "acting" designation under the FVRA.

This conclusion respects the "well established" and "commonplace" interpretive canon that "the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. Trans World Airline, Inc.*, 504 U.S. 374, 384 (1992)); *accord Morton v. Mancari*, 417 U.S. 535, 550 (1974) (instructing that "a specific provision applying to a very specific situation" controls over a law "of general application"); *United States v. Bormes*, 568 U.S. 6, 12–13 (2012) (applying the canon to statutes enacted at different times). The canon does not require an express "contradiction" between the statutes: it applies even where the specific and general provisions appear to "exist side-by-side," thus avoiding "the superfluity of a specific provision that is swallowed by the general one." *RadLAX*, 566 U.S. at 645.

The canon resolves any uncertainty here about the application of § 546(c)(2)'s 120-day clock. That provision specifically applies to individuals appointed for temporary service as U.S. Attorney under § 546(a). To invoke the FVRA's more general timelines for such an individual would generate a conflict between the statutes. At the very least, reliance on the FVRA's more generous timing would render the office-specific limit at § 546(c)(2) superfluous. Accordingly, the "terms of the specific authorization," here the 120-day clock, "must be complied with." *RadLAX*, 566 U.S. at 645.

That conclusion is strengthened by the fact that § 546(c)(2)'s time limit is newer than the FVRA. "When two statutes conflict the general rule is that the

statute last in time prevails as the most recent expression of the legislature's will." *Boudette v. Barnette*, 923 F.2d 754, 757 (9th Cir. 1991).[31]  Section 546(c)'s 120-day limit hails from 2007, having been re-added to the statute as part of the Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224, 224.  The FVRA's time limits, by contrast, date back to 1998.  *See* Federal Vacancies Reform Act of 1998, Pub. L. No. 105-277, § 151(b), 112 Stat. 2681, 2681-611–16.  That § 546(c)(2) is "*both* later in time *and* more specific" thus cements it control over the general FVRA time limits.  *Murphy Co. v. Biden*, 65 F.4th 1122, 1140 (9th Cir. 2023) (Tallman, J., concurring in part and dissenting in part).

Congress enacted § 546(c)(2)'s specific time limit despite knowing it had the more general FVRA time limits available to choose instead.  That knowing choice of an office-specific limit controls here, and it invalidates Mr. Essayli's temporary service beyond the July 30 expiration of his § 546(c)(2) clock.

## II.B.    A contrary reading would render § 546(d) superfluous.

The administration's attempt to extend Mr. Essayli's appointment beyond the 120 days authorized by § 546(c)(2) would improperly render § 546(d)'s

---

[31] *See, e.g.*, *United States v. Estate of Romani*, 523 U.S. 517, 530–31 (1998) ("[A] specific policy embodied in a later federal statute should control our construction of [an earlier] statute, even though [the earlier statute] had not been expressly amended."); *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1165 (9th Cir. 2022) ("If the newer statute comes closer to addressing the very problem posed by the case at hand, it is as if the later-enacted statute effectively repealed the conflicting provisions of the earlier one.") (cleaned up).

judicial appointment power superfluous. *See Giraud*, 2025 WL 2416737, at *9–10, *27–28 (applying anti-surplusage principles to the government's statutory interpretations). That authority is triggered by the expiration of the 120-day clock. 28 U.S.C. § 546(d). But the administration's maneuver here—designating the soon-to-be-expired interim appointee for acting service under the FVRA on the 119th day—would permit it to avoid ever triggering the district court's § 546(d) authority. As a result, that authority "would lie dormant in all but the most unlikely situations." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

The Court should decline to read the statutes in a manner that erases this important structural component of the vacancies regime that Congress prescribed. *See id.*; *Corley v. United States*, 556 U.S. 303, 314 (2009) (identifying as "one of the most basic interpretive canons" that "that a statute should be construed so that effect is given to all its provisions"). That rule applies "with special force" where a potential interpretation would "render an entire subparagraph meaningless"—as the government's interpretation would do to § 546(d) here. *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (cleaned up). And it is "still more" forceful "when the subparagraph is so evidently designed to serve a concrete function"—here, incentivizing timely engagement with the Senate's advice-and-consent function and, as a backstop, shifting appointment authority from one branch to another. *Id.*

Unconstrained by § 546's limitations and unchecked by the other branches, the administration's theory would permit it to make successive FVRA designations in perpetuity. For example, as *Giraud* explained, the government's

view of the statutes is that it could repeatedly appoint temporary

U.S. Attorneys—even the same person—indefinitely, so long as it obtains a

purported resignation every 119 days.  *See* 2025 WL 2416737, at *10 & n.114.

That would render the district court's § 546(d) authority a nullity, because the

120-day clock would never expire.

That is an untenable superfluity that runs directly contrary to Congress's

purpose of incentivizing permanent nominations and allocating authority among

the other branches.  *See TRW Inc.*, 531 U.S. at 31.  Indeed, as then-Deputy

Assistant Attorney General Samuel Alito explained the Department's

interpretation of the statute in 1986, the "statutory plan discloses a Congressional

purpose that after the expiration of the 120-day period further interim

appointments are to be made by the court [under § 546(d)] rather than by the

Attorney General."  Memo. from Samuel A. Alito, Jr., to William P. Tyson

(Nov. 13, 1986).[32]

Such surplusage is particularly to be avoided given the historical and

constitutional background.  The constitution vests in Congress the decision to

deviate from the default requirement of Presidential nomination and Senate

confirmation.  U.S. Const. art. II, § 2, cl. 2.  And across more than 150 years,

Congress has chosen to involve the district courts in filling U.S. Attorney

vacancies.  In fact, the district courts' involvement pre-dates the Attorney

General's interim appointment authority by 125 years; before 1986, the judiciary

---

[32] *Available at United States v. Pina*, No. 2:25-cr-436 (D.N.J. filed Aug. 14, 2025), Dkt. 61-1.

possessed that authority exclusively. *See* H.R. Rep. No. 110-58, at 4 (2007).[33]

Judicial appointment is, in short, "the rule." *Cuomo v. Clearing House
Ass'n, LLC*, 557 U.S. 519, 530 (2009). The Court should not allow the more
recent "exception" of executive involvement to "swallow" that longstanding
practice and nullify the judicial power. *Id.*

Unsurprisingly, historical practice confirms the understanding that these
two appointment authorities work in tandem as Congress intended. Until now, a
near-expired § 546(a) appointee would typically be submitted to the appropriate
federal district court for potential re-appointment under § 546(d).[34] Rather than
follow that routine practice, however, this administration is now embracing an
interpretation of the statutes that would make § 546(d) irrelevant "in all but the
most unlikely situations." *TRW Inc.*, 534 U.S. at 31. That calls its novel strategy
into doubt. *See id.*; *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197,
220 (2020) (identifying novelty as one of "the most telling indication of a severe

---

[33] Exclusive judicial power to fill U.S. Attorney vacancies dates to at least 1863.
Act of Mar. 3, 1863, ch. 93, § 2, 12 Stat. 768, 768 (1863) ("In case of a
vacancy in the office of . . . district attorney in any circuit, the judge of such
circuit may fill such vacancy, and the person so appointed shall serve until an
appointment shall be made by the President, and the appointee has duly
qualified."); *see generally* Bruce A. Green & Rebecca Roiphe, *Depoliticizing
Federal Prosecution*, 100 Denv. L. Rev. 817, 836-37 (2023).

[34] *See* Ross E. Wiener, *Inter-Branch Appointments After the Independent
Counsel: Court Appointment of United States Attorneys*, 86 Minn. L. Rev. 363,
399–400 (2001); Statement of U.S. Attorney Geoffrey S. Berman on
Appointment by Chief Judge, U.S. Dep't of Justice (updated Apr. 25, 2018),
https://perma.cc/9DBM-7QA9.

constitutional problem") (cleaned up).

The defense's reading, by contrast, suffers from neither a surplusage problem nor a novelty one. *See Corley*, 556 U.S. at 314. Under the defense's view, the FVRA's general time limits still have meaningful effect—they apply to all sorts of acting officials, including an acting U.S. Attorney—other than an individual for whom the 120-day clock has been triggered upon appointment as interim U.S. Attorney under § 546(a). *See id.*; *cf. Gorecki v. Comm'r, Soc. Sec. Admin.*, 143 F.4th 1295, 1288-1301 (11th Cir. 2025) (discussing FVRA time limits for an acting commissioner of the Social Security Administration).

Only under the defense's reading do the two statutes work together harmoniously as intended. Congress sensibly gave the executive a choice between two distinct options—§ 546(a) and § 3345—in a manner that protects Congress' interest in the advice-and-consent process. Without burdening the President, the Attorney General can select virtually anyone to serve under § 546(a), providing flexibility and speed in filing a vacancy. But that selection lasts only a few months and cannot be extended without court approval, incentivizing a quick Presidential nomination. Alternatively, the President can intervene and make an FVRA selection—and secure its longer timelines—but the selection must come from a closed universe of senior officials, including those who have already been subjected to advice and consent, and excluding those who were previously selected under § 546.

### II.C.    The Court should enforce § 546's 120-day limit to prevent the "mischief" that prompted its enactment.

Section 546(c)(2)'s 120-day time limit should be strictly enforced to prevent the very "mischief" it was designed to counteract. Congress enacted § 546(c)(2) because it perceived that the Executive Branch was subverting the traditional Senate confirmation process with indefinite "interim" U.S. Attorney appointments. And that is essentially what the administration would authorize itself to do here with its potentially endless interim-followed-by-acting maneuver. Section 546 is properly interpreted to avoid that result.

A statute's meaning must be informed by the "mischief" that prompted its enactment. *See, e.g.*, *Bond v. United States*, 572 U.S. 844, 866 (2014); Samuel L. Bray, *The Mischief Rule*, 109 Geo. L. J. 967 (2021) (explaining the rule's history and collecting cases). Courts can thus properly discern the statute's meaning from "the context from which the statute arose", *Bond*, 572 U.S. at 866, especially where a statute is designed to target a particular "problem," *In re Fairfield Sentry Ltd.*, No. 22-2101, 2025 WL 2218836, at *13 (2d Cir. 2025); *see also TRW Inc.*, 534 U.S. at 29 (warning against interpretations that run "contrary to Congress' apparent intent"). As specifically relevant here, a statute should be interpreted to prevent "clever evasions" that would allow the legislatively addressed problem to continue. Bray, *The Mischief Rule*, 109 Geo. L. J. at 1005–

07.[35]

These principles confirm that an administration cannot extend an interim appointee's service past § 546(c)'s 120-day limit by invoking § 3345. That 120-day clock was enacted in 2007 to combat a particular mischief that concerned Congress: the indefinite replacement of Senate-confirmed U.S. Attorneys with non-confirmed temporary appointments. In early 2006, and with minimal public discussion, Congress removed all time limits on non-confirmed "interim" U.S. Attorney appointments.[36] Then, in December 2006, the administration capitalized on its newly expanded temporary appointment powers by firing various Senate-confirmed U.S. Attorneys and indefinitely replacing them with non-confirmed interim appointees.[37] Such moves, members of Congress worried, would permit

---

[35] *See also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (explaining that the Federal Arbitration Act "was enacted in 1925 in response to widespread judicial hostility to arbitration agreements" and reading the savings clause of that Act narrowly to prevent circumvention of that legislative direction); *NLRB v. Hearst Pubs.*, 322 U.S. 111, 126 (1944) (reading "employee" to cover independent contractors because "[t]he mischief at which the Act is aimed and the remedies it offers are not confined exclusively to 'employees' within the traditional legal distinctions separating them from 'independent contractors'"), *superseded by statute as recognized by Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 324–25 (1992).

[36] *See* USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 502, 120 Stat. 192, 246; H.R. Rep. No. 110-58 (2007) (noting that the time-limit removal in 2006 was "inserted quietly into the conference report on the 2005 Act, without debate").

[37] *See, e.g.*, 153 Cong. Rec. S1993-01 (daily ed. Feb. 15, 2007) (statement of Sen. Leahy, Senate cosponsor) ("We learned recently that the Department of Justice has asked several outstanding U.S. attorneys from around the country

---

the executive to improperly skirt the Senate confirmation process—and

undermine longstanding Senate practice favoring home-state Senator input in the

selection of U.S. Attorneys (the so-called "blue slip" process).[38]  In response, a

month after the administration began installing its interim U.S. Attorneys,

Senators Feinstein and Leahy introduced what would eventually become

_____

to resign their positions. . . . We also understand the Attorney General has or is planning to appoint interim replacements for the U.S. attorneys he is removing, raising a potential of avoiding the Senate confirmation process altogether."); *id.* (statement of Sen. Schumer, Senate cosponsor) (identifying "concerns that politics was involved in several of these firings"); 153 Cong. Rec. H5553-01 (daily ed. May 22, 2007) (statement of Rep. Keller) ("[I]t is fairly obvious that the motivation behind this legislation was the dismissal of several U.S. attorneys earlier this year."); *id.* (statement of Rep. Lofgren) (identifying that the Act would address "the dismissal of eight, now nine, U.S. attorneys" and their replacement with interim appointees); *id.* (statement of Rep. Jackson-Lee) (identifying that the Act would address "that after gaining this increased authority to appoint interim United States Attorneys indefinitely, the administration has exploited the provision to fire United States Attorneys for political reasons").

[38] *See, e.g.*, 153 Cong. Rec. S1993-01 (daily ed. Feb. 15, 2007) (statement of Sen. Leahy, Senate cosponsor) (expressing concern that an interim U.S. Attorney for the Eastern District of Arkansas had been named without "an agreement with the two home State Senators"; "Why were home State Senators not consulted in advance?"); 153 Cong. Rec. H5553-01 (daily ed. May 22, 2007) (statement of Rep. Sanchez) (expressing concern about an executive branch email suggesting that an interim appointment would allow the "Justice Department [to] 'give far less deference to home-State Senators and thereby get (1) our preferred person appointed and (2) do it far faster and more efficiently, at less political cost to the White House.'"); *id.* (statement of Rep. Jackson-Lee) ("The President usually accepts the nominee recommended by the Senator or other official.  This tradition, called 'Senatorial courtesy,' serves as an informal check on the President's appointment power.").

§ 546(c).[39]

The result was a 120-day limit designed to prevent lengthy service by non-confirmed U.S. Attorneys chosen unilaterally by the executive—the core issue here. As group of recent members of Congress described to the *Giraud* court, the statute's language "reflected Congress's considered judgment—rooted in the Constitution's separation of powers framework—that the appointment of U.S. Attorneys must be subject to meaningful checks, including the Senate's advice and consent, except in limited circumstances expressly provided by law." Br. of Amici Former Republican Members of Congress 1, *United States v. Giraud*, No. 1:24-cr-768 (D.N.J. Aug. 13, 2025), Dkt. 138-2. Congressional analysis at the time of § 546(c)'s enactment likewise emphasized that the time limit would prevent administrations from subverting the Senate's confirmation role beyond the 120-day limit.[40]

Congress was not just concerned about executive circumvention in general. The drafters made clear that they understood they were enacting § 546(c) to

---

[39] *See* S. 214, 110th Cong. (2007). The bill was eventually passed 94–2 in the Senate, passed 306–114 in the House, and was signed into law by President Bush as the Preserving United States Attorney Independence Act of 2007, Pub. L. No. 110-34, § 2, 121 Stat. 224, 22.

[40] *See, e.g.*, 153 Cong. Rec. H5553-01 (daily ed. May 22, 2007) (statement of Rep. Conyers, House cosponsor) (identifying that the Act would limit the executive branch from "appoint[ing] interim temporary U.S. attorneys without the customary safeguard of Senate confirmation"); *id.* (statement of Rep. Sanchez) ("This would ensure that interim U.S. Attorneys appointed since the purge scheme was hatched are not permitted to serve indefinitely and without Senate confirmation.").

prevent the exact maneuver the administration is now deploying.  Senator Patrick

Leahy (co-sponsor of the § 546(c) amendment and then-chair of the Senate

Judiciary Committee) described the "sequential[]" interim-plus-acting

maneuver—like the one at issue here—as an "erroneous" interpretation of the

§ 546(c) amendments that "runs afoul of congressional intent and the law":

> Yet, even as we closed one loophole, the administration has been
> exploiting others to continue to avoid coming to the Senate.  Under
> the guidance of an erroneous opinion of the Justice Department's
> Office of Legal Counsel, the administration has been naming acting
> U.S. attorneys and interim U.S. attorneys sequentially.  They have
> used this misguided approach to put somebody in place for 330 days
> without the advice and consent of the Senate.  This approach runs
> afoul of congressional intent and the law.

153 Cong. Rec. S15227-01 (daily ed. Dec. 12, 2007) (Statement of Sen. Leahy);

*accord* Statement of Senator Patrick Leahy to the Senate Judiciary Committee,

2008 WL 189313 (Jan. 22, 2008) (similar, describing an administration's

attempted interim-plus-acting maneuver as an "erroneous" use of "the Vacancies

Act").  The Court should reject the administration's brazen attempt to do

precisely what Congress forbade.

*    *    *

The U.S. Attorney-specific 120-day limit at § 546(c)(2) governs over the

more general FVRA timeline.  Otherwise, the district court's 150-plus-years-old

statutory appointment power would be written out of the statute, frustrating the

Senate's constitutional advice-and-consent duty.  All that is particularly troubling

because Congress enacted § 546(c) to address just this sort of mischief.  The

Court should thus hold that Mr. Essayli's temporary service as U.S. Attorney was

capped at 120 days under § 546(c)(2), despite the administration's invocation of § 3345.

## III.    The Appointments Clause requires an interim or acting U.S. Attorney to be Senate-confirmed.

If the Court concludes that Mr. Essayli's ongoing service as acting U.S. Attorney complies with the governing statutes, it will be ratifying a vacancy scheme in which the Attorney General can designate never-confirmed individuals to serve as temporary U.S. Attorneys in perpetuity.  Such a regime is incompatible with the Appointments Clause, which requires Senate confirmation for all principal officers, including individuals acting as U.S. Attorneys.[41]

### III.A.    U.S. Attorneys are principal officers requiring Senate confirmation.

The Supreme Court has historically offered differing modes of analysis for distinguishing between "principal" officers requiring Senate confirmation and inferior officers who can be appointed without it.  Under any of these articulations, U.S. Attorneys are principal officers who must be appointed by the

---

[41] The Appointments Clause provides: "The President … shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2.

President and confirmed by the Senate.  U.S. Const. art. II, § 2, cl. 2.[42]  The same requirement applies to acting U.S. Attorneys, as described in the next section below.

In *Morrison v. Olson*, the Supreme Court concluded that an independent counsel was an inferior officer whose appointment by a special division of the D.C. Circuit complied with the Appointments Clause.  487 U.S. 654, 670–77 (1988).  Four factors supported that inferior-officer conclusion: "that the independent counsel was subject to removal by a higher officer (the Attorney General), that she performed only limited duties, that her jurisdiction was narrow, and that her tenure was limited."  *Edmond v. United States*, 520 U.S. 651, 661 (1997) (citing *Morrison*, 487 U.S. at 671–72).

Each of those factors cuts the other way here.  U.S. Attorneys, unlike independent counsels, are not removable not by the Attorney General but rather only by the President.  28 U.S.C. § 541(c).  Their duties are sweeping, not "limited,": they include "prosecut[ing] all offenses against the United States," *id.* § 547(1), and litigating "all civil actions, suits or proceedings in which the United States is concerned," *id.* § 547(2).  They serve as "the chief federal law enforcement official for the judicial district," *Nadler v. Mann*, 951 F.2d 301, 305 (11th Cir. 1992) (citing *id.* §§ 541, 547)—here, that jurisdiction covers the most

---

[42] The Supreme Court has never directly addressed this question.  Dicta in *Myers v. United States* suggested that U.S. Attorneys are inferior officers, but the issue was not before the Court in that case concerning a postmaster's removal.  272 U.S. 52, 159 (1926).

populous judicial district in the country, with nearly 20 million people and four of California's five largest counties. And their tenure, far from being "limited" to specific matters or tasks, reaches all litigation within their jurisdiction and continues indefinitely until a "successor is appointed and qualifies." 28 U.S.C. § 541(b).

*Edmond* clarified that *Morrison*'s factors did not constitute a "definitive test." 520 U.S. at 661. But many of the factors emphasized in *Edmond* are likewise absent as to U.S. Attorneys. No Senate-confirmed officer (like the Attorney General) exercises the "powerful tool for control" that is removal from office. *Id.* at 664. And U.S. Attorneys routinely and unilaterally "render a final decision on behalf of the United States," *id.* at 665, for example, by approving negotiated plea agreements in the vast majority of criminal matters and by approving settlements in many civil matters, *see* U.S. Dep't of Just., Just. Manual §§ 4-1.300, 9-27.450.

The fact that the Attorney General supervises the work of U.S. Attorneys in some respects does not defeat their status as principal officers. Even extensive supervision and oversight by a Senate-confirmed official cannot render supervisees inferior if they exercise significant and binding executive authority on their own. *See United States v. Arthrex, Inc.*, 594 U.S. 1, 16–17 (2021). In finding an Appointments Clause problem with respect to Administrative Patent Judges in *Arthrex*, the Supreme Court explained, "In all the ways that matter to the parties who appear before the [Patent Trial and Appeal Board], the buck stops with the APJs, not with the Secretary or Director." *Id.* at 17; *see also*

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1339 (D.C. Cir. 2012) ("We find that, given the [Copyright Royalty Judges'] nonremovability and the finality of their decisions…, the Librarian's and Register's supervision functions still fall far short of the kind that would render the CRJs inferior officers."). So, too, with U.S. Attorneys. For the mine-run of defendants, the local U.S. Attorney initiates the prosecution, controls dismissal, and negotiates binding agreements without approval or review by Washington, D.C. The buck stops with them—not the Attorney General.

*Arthrex* demonstrates why the Ninth Circuit previously erred in concluding in *Gantt* that U.S. Attorneys are inferior officers. *See United States v. Gantt*, 194 F.3d 987, 999–1000 (9th Cir. 1999), *overruled on other grounds by United States v. W.R. Grace*, 526 F.3d 499, 506 (9th Cir. 2008) (en banc)). The *Gantt* panel relied on the Attorney General's statutory authority to reassign cases, set salaries, and approve reimbursements. *Id.* At the same time, without any reasoning, it brushed aside a "significant statutory limit on the Attorney General's supervision of United States Attorneys," i.e., "Congress' decision to vest appointment and removal power in the President." *Id.* at 1000. *Arthrex* squarely undermined *Gantt*'s analysis. Just as the U.S. Attorneys addressed in *Gantt* are subject to salary decisions, administrative oversight, and the threat of reassignment by the Attorney General, the APJs in *Arthrex* were subject to comprehensive administrative supervision and the threat of reassignment by the Secretary of Commerce. But critically, neither official is removable at will. 594 U.S. at 15–17. That higher officials supervised aspects of the APJs' work did not cure the

Appointments Clause problem in *Arthrex*, and it does not do so here.  Because *Gantt* is "clearly irreconcilable" with *Arthrex*, this Court is bound by the latter and should "reject [*Gantt*] as having been effectively overruled."  *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

### III.B.    Under the government's interpretation of the statutes, interim and acting U.S. Attorneys are principal officers requiring Senate confirmation.

Mr. Essayli's designation as an interim or acting U.S. Attorney does not solve the constitutional problem.  Unbounded by the time limitations imposed by Congress, Mr. Essayli's service is temporary in name only—and he is therefore purporting to serve in a principal-officer role that requires Senate confirmation.

Courts have historically conferred inferior-officer status on individuals designated to serve temporarily in roles that would otherwise be categorized as principal officers.  *See, e.g.*, *United States v. Eaton*, 169 U.S. 331, 343–44 (1898) (acting Consul General); *Rop v. Fed. Hous. Fin. Agency*, 50 F.4th 562, 569–74 (6th Cir. 2022) (acting FHFA Director).

But that principle has always presumed compliance with the significant limitations imposed by Congress on temporary service.  Officials acting on a temporary basis are inferior when they serve "for a limited time, and under special and temporary conditions."  *Eaton*, 169 U.S. at 343.  In *Rop*, the Sixth Circuit recognized "concerns that a President could abuse [a vacancy provision] by unilaterally firing the [FHFA] Director and indefinitely replacing him with an Acting Director, with no intent of ever seeking the advice and consent of the

Senate." 50 F.4th at 571.  Those concerns were "alleviate[d]" because Congress can set limits on the President's ability to fill vacancies, including by restricting the circumstances in which the vacancy can be filled and by setting a time limit on the acting official's service.  *Id.*; *accord id.* at 585 (Thapar, J., concurring in part and dissenting in part) (rejecting the proposition that an acting official can constitutionally "perform every function of his office indefinitely, with no end in sight" and "limited only by the President's inclination to appoint a successor").

The government's current approach to designating acting U.S. Attorneys— potentially in perpetuity—carries no such limitations and therefore violates the Appointments Clause.  As Justice Thomas has explained, there is "nothing 'special and temporary'" about indefinite service in a principal-officer role, and "the structural protections of the Appointments Clause" cannot "be avoided based on such trivial distinctions" like merely labeling an official as "acting."  *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 313 n.1 (2017) (Thomas, J., concurring) (quoting *Eaton*, 169 U.S. at 343).

The Court can and should resolve this motion based on the statutory arguments set out above.  But if it concludes that Mr. Essayli's acting service complies with the governing statutes as a technical matter, the Constitution provides a backstop, and the Court should reject Mr. Essayli's continued service as incompatible with the Appointments Clause.

## IV.    The Court should issue all appropriate remedies for Mr. Essayli's unlawful actions and supervision.

Because Mr. Essayli is not validly serving as the acting U.S. Attorney, the

1  Court should apply appropriate remedies to address his unlawful actions and

2  supervision.  *See Lucia v. SEC*, 585 U.S. 237, 251 (2018) ("One who makes a

3  timely challenge to the constitutional validity of the appointment of an officer

4  who adjudicates his case is entitled to relief."); *Ryder v. United States*, 515 U.S.

5  177, 182-83 (1995) (similar).  In addition to any other relief the Court thinks

6  proper, it should void the indictment and dismiss it with prejudice (or, in the

7  alternative, without prejudice).  It should also disqualify Mr. Essayli from

8  participating in criminal prosecutions in this district, along with any attorneys

9  acting under his supervision.

### IV.A.    The Court should void and dismiss the indictment with prejudice.

12      On information and belief, Mr. Essayli approved this prosecution in his

13  capacity as acting U.S. Attorney by authorizing the government to seek the

14  indictment.  The indictment was signed under Mr. Essayli's name by an assistant

15  U.S. Attorney acting under his supervision.  Dkt. 13, at 5.  Because Mr. Essayli

16  was acting without lawful authority, the Court should void and dismiss the

17  indictment.

18      ***Voiding.***  Because Mr. Essayli acted without lawful authority in

19  supervising, approving, and appearing as a signatory on the indictment, the Court

20  should declare the indictment void.  That was the result as to the one defendant at

21  issue in *Giraud* whose indictment the official had signed while acting without

lawful authorization.  2025 WL 2416737, at *27.[43]

**Dismissal.**  When an "exercise of prosecutorial power has not been authorized by law," as one district court recently explained, "the Court sees no way forward aside from dismissal" of the indictment.  *United States v. Trump*, 740 F. Supp. 3d 1245, 1302 (S.D. Fla. 2024), *appeal dismissed*, No. 24-12311, 2025 WL 2017539 (11th Cir. Feb. 11, 2025).  Given Mr. Essayli's role in supervising and initiating this prosecution, undertaken without lawful authority, this Court should dismiss the indictment.

The Ninth Circuit has explained that dismissal is available "(1) to implement a remedy for the violation of a recognized statutory or constitutional right; (2) to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and (3) to deter future illegal conduct."  *United States v. Bundy*, 968 F.3d 1019, 1030 (9th Cir. 2020) (quoting *United States v. Struckman*, 611 F.3d 560, 574 (9th Cir. 2010)).

All three factors are present here.  A private citizen—not lawfully appointed to any government position—is purporting to wield one of the most powerful offices in our criminal-justice system.  Other private individuals' liberty

---

[43] For purposes of this issue, the Court need not decide the threshold question addressed in *Giraud* concerning whether the indictment is merely voidable or already void.  Even if it is merely voidable, the remedy—as in *Giraud*—would be for the Court to declare it void.  *See id.* at *26–27.  There is no evidence that Mr. Essayli's actions have been lawfully ratified, but the defense reserves the right to respond to any evidence or argument the government may offer to that effect, including by arguing that the indictment was void ab initio under § 3348(d)(1).

is on the line. Mr. Essayli's conduct therefore violated—and daily continues to violate—their rights under the Due Process and Appointments Clauses, including to prosecution and the deprivation of liberty only at the hands of lawfully authorized officials. *See* U.S. Const. art. II, § 2, cl. 2; U.S. Const. amend. V; *Donziger v. United States*, 143 S. Ct. 868, 870 (2023) (Gorsuch, J., dissenting from the denial of cert.) ("However much the district court may have thought Mr. Donziger warranted punishment, the prosecution in this case broke a basic constitutional promise essential to our liberty.").

These violations are accompanied by a corresponding threat to court integrity and a grave need to deter persistent unlawful conduct. The Court should consider that this is no mistake or technicality: the administration intentionally performed what it openly described as a "trick" and what has turned out—in at least five judicial districts—to be an end-run around fundamental statutory and constitutional safeguards.

The *Giraud* Court voided but declined to dismiss the indictment (against Mr. Pina) unlawfully signed by the purportedly acting U.S. Attorney. 2025 WL 2416737, at *28–30. But it did so on a factual record not present here. Before concluding that Mr. Pina had not been prejudiced by the unlawful conduct, it "reviewed the facts of the grand jury proceeding," including the "grand jury materials" and "internal routing documents" from the U.S. Attorney's office to determine the extent to which the purportedly acting official had been involved beyond signing her name to the indictment. *Id.* at *29. At the end of the day, her unauthorized involvement was limited to that signature, because the necessary

approvals came before her § 546(c)(2) clock had expired. *Id.* Analyzing the invalid signature on its own under Federal Rule of Criminal Procedure 7(c)(1), the Court found no prejudicial error. *Id.* [44]

If this Court is not inclined to dismiss the indictment based on the violations already evident on the face of the record, it should at least authorize discovery to develop these factual issues, including the extent to which Mr. Essayli investigated, supervised, or approved this prosecution while acting without lawful authority. Those steps were essential in *Giraud*, because they provided the basis for the district court's conclusion that the unauthorized activity was limited to a mere signature that could be evaluated for harmless error. *See*

_____

[44] In *United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999), the defendant argued the government's interlocutory appeal was improper because the relevant statute requires the U.S. Attorney to personally certify the appeal, and the defendant maintained the certifying interim U.S. Attorney was invalidly appointed. *Gantt* suggested in dicta that even if an interim U.S. Attorney had been invalidly appointed, the invalid appointment would not necessarily render an indictment defective because, under Federal Rule of Criminal Procedure 7(c)(1), an indictment "need only be signed by an 'attorney for the government,'" not the U.S. Attorney specifically. *Id.* at 988. Because this statement was dicta and not germane to the holding, it should be deemed nonbinding. *See, e.g.*, *Stein v. Kaiser Found. Health Plan, Inc.*, 115 F.4th 1244, 1248-54 (9th Cir. 2024) (en banc) (Forrest, J., concurring) (discussing the nature of dicta). Binding or not, the case provides scant guidance on the remedial question here, because the defense's argument depends not solely on Rule 7(c)(1)'s signature requirement but also on the U.S. Attorney's obligations under 28 U.S.C. § 547, confirmed by the Justice Manual, to authorize a prosecution. Nor did *Gantt* involve an argument for dismissal based on a due process violation or the court's inherent supervisory powers. If the Court concludes *Gantt* is binding with respect to remedy, the defense preserves a challenge to *Gantt* and the Court's application of it for further review.

*id.* at \*29–30.

    ***Dismissal with prejudice.***  The dismissal should be with prejudice.  To impose that remedy, the Court need not find that it is "the only remedy"—just that "no lesser remedy will fully address the damage caused by the government's misconduct." *Bundy*, 968 F.3d at 1043.  Based on the information so far available to the defense, including public reporting, Mr. Essayli's supervision without lawful authority has permeated his office and included granular decisions overruling the findings of the government's own agents and line prosecutors— including as to whether and how to charge specific defendants.[45]  "All actions that flowed from his defective appointment," including but *not* limited to obtaining the instant indictment, "were unlawful exercises of executive power." *Trump*, 740 F. Supp. 3d at 1303.[46]

    No lesser remedy will undo that damage for at least two reasons.  First, because Mr. Essayli approved and supervised the investigation and prosecution writ large—and not just the indictment—leaving open the possibility of a new indictment would not cure those other unlawful actions.  Second, as noted just

---

[45]  Ben Penn & Maia Spoto, *Trump's LA Prosecutor Orders Cases His Staff Say Lack Evidence*, Bloomberg Law (updated July 29, 2025), https://news.bloomberglaw.com/us-law-week/trumps-la-prosecutor-orders-cases-his-staff-say-lack-evidence.

[46]  *See also United States v. Williams*, 65 F.R.D. 422, 448–49 (W.D. Mo. 1974) (dismissing with prejudice because the prosecutors lacked authority to act within the district); *United States v. Huston*, 28 F.2d 451, 456 (N.D. Ohio 1928) (setting aside the indictment for similar reasons but failing to specify whether the remedy was with or without prejudice); *United States v. Rosenthal*, 121 F. 862, 873–74 (C.C.S.D.N.Y. 1903) (similar).

above, the government's unlawful maneuvers have been undertaken intentionally with the goal of circumventing statutory and constitutional safeguards. They have spread across the country, and even in this district alone, at least 16 indictments have been obtained against clients of the Federal Public Defender's Office in Mr. Essayli's name since his term expired on July 30. Dismissing the indictment without prejudice could amount to even less than a slap on the wrist and a minor procedural obstacle—effectively encouraging the government to continue with its brazen and unlawful approach to temporary appointments.

Although the Court need not reach the issue, dismissal without prejudice is likely to lead to additional, unnecessary litigation over whether Mr. Essayli's unlawful actions can later be ratified by some other, properly appointed official. Under the defense's view, the answer is no: the approval and obtaining of the indictment under Mr. Essayli's invalid authority were a "function or duty" of the office of the U.S. Attorney within the meaning of 5 U.S.C. § 3348(d)(1). Under § 3348(d)(2), those actions "may not be ratified." Should the government attempt to file a new indictment, that would violate the § 3348 ratification bar, and that new indictment, too, would need to be dismissed. The Court can and should nip this ongoing violation in the bud by dismissing with prejudice now.

In the alternative, the Court should dismiss the indictment without prejudice. For all the reasons just argued, allowing the indictment to go undismissed would provide little meaningful remedial relief to the defense and would invite further government mischief of the very kind Congress sought to

prevent. *See Bundy*, 968 F.3d at 1042–43; *Trump*, 740 F. Supp. 3d at 1302–04. As the *Trump* Court explained, lesser remedies may be appropriate where the defect is a technical one that does not affect whether an individual is lawfully serving in the relevant office. 740 F. Supp. 3d at 1302 n.62. But that "is not the case here": where the matter goes to the core of appointment," *id.*, and where the violations infect "[a]ll actions that flowed from [the] defective appointment," there is "no alternative course" other than dismissal, *id.* at 1303.

### IV.B.    The Court should disqualify Mr. Essayli and his supervisees from participating in criminal proceedings in this district.

Because he is not acting in any lawful capacity, the Court should also disqualify Mr. Essayli and any attorneys working under his supervision from participating in criminal prosecutions in this district. *See Giraud*, 2025 WL 2416737, at *26–27; *Giraud Aug. 1 Op.*, 2025 WL 2196794, at *8 & n.77 (citing *Collins v. Yellen*, 594 U.S. 220, 257-58 (2021)). At the very least, the Court should disqualify Mr. Essayli and his supervisees from participating in this matter. If the indictment is not dismissed, the proceedings in this matter should then be stayed until someone is lawfully designated or appointed to serve as U.S. Attorney.

Criminal defendants in this district, including Mr. Garcia, "face imminent threat of [Mr. Essayli] taking action against them," even though he "is not lawfully holding the office of United States Attorney." *Giraud*, 2025 WL 2416737, at *27 (citing *Gonzales & Gonzales Bonds & Ins. Agency, Inc. v. U.S.*

*Dep't of Homeland Sec.*, 107 F.4th 1064, 1077 (9th Cir. 2024)). "In this posture, the only sure solution for the defendants' timely challenge … is to bar [him] from taking such actions in the first place." *Id.*; *see also Bullock v. U.S. Bureau of Land Mgmt.*, 489 F. Supp. 3d 1112, 1130–31 (D. Mont. 2020) (enjoining continued unlawful action and delegations by BLM director serving in violation of the FVRA).

As to assistant U.S. Attorneys or other line prosecutors whom Mr. Essayli has supervised, the defense does not suggest that they should be permanently disqualified from further participation. Rather, if "an AUSA is operating at the express direction of an official who is improperly appointed, the Court can validly bar them from doing so: 'if the United States Attorney's appointment is invalid, then her delegation is similarly invalid.'" *Giraud Aug. 1 Op.*, 2025 WL 2196794, at *9 (quoting *Gantt*, 194 F.3d at 998). As in *Giraud*, the Court should disqualify attorneys in Mr. Essayli's office unless and until they are supervised by someone who is a lawfully authorized government official with the power to undertake criminal prosecutions. Because Mr. Essayli is a private citizen, the "injunctive relief [of disqualification] should extend to AUSAs purporting to operate pursuant to [his] authority." *Id.* at *11.

# CONCLUSION

The Court should void and dismiss the indictment with prejudice, and it should disqualify Mr. Essayli and his supervisees from participating in criminal prosecutions in this district.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

Dated: August 28, 2025       By: */s/ James Anglin Flynn*
                                  JAMES ANGLIN FLYNN
                                  DREW HAVENS
                                  Deputy Federal Public Defenders

                                  *Attorneys for Defendant Ismael Garcia*